**Vernon Leo WEBSTER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–98–374–CR.**

Court of Appeals of Texas, Waco.

Aug. 9, 2000.

Rehearing Overruled Oct. 4, 2000.

---

Stan Schwieger, Law Office of Stan Schwieger, Waco, for appellant.

Robert W. Gage, County/Dist. Atty., R. Neel McDonald, Asst. County Atty., Fairfield, for appellee.

Before Chief Justice DAVIS, Justice VANCE and Justice GRAY.

## O P I N I O N

REX D. DAVIS, Chief Justice.

A jury convicted Vernon Leo Webster of felony driving while intoxicated. *See* TEX. PEN.CODE ANN. § 49.04(a) (Vernon Supp. 2000); Act of April 25, 1995, 74th Leg., R.S., ch. 76, § 14.56, 1995 Tex. Gen. Laws 458, 841 (amended 1999) (current version at TEX. PEN.CODE ANN. § 49.09(b) (Vernon Supp.2000)). The court sentenced Webster to five years' confinement, suspended imposition of sentence, and placed him on community supervision for ten years. Webster presents three issues in which he claims the court erred by: (1) allowing the State to introduce evidence concerning the horizontal gaze nystagmus [1] ("HGN") test administered to him by one of the arresting officers; (2) failing to grant a mistrial after this officer testified to a correlation between a person's blood-alcohol concentration and the results of his HGN test; and (3) "allowing lay testimony concerning the potential intoxication of the combination of drugs and alcohol."

## BACKGROUND

On the date in question, Fairfield Police Officer Steve Brooks received a dispatch concerning a domestic disturbance between Webster and his former wife Vicki. Brooks went to Vicki's apartment to investigate. Vicki told Brooks that Webster had assaulted her and that he was "drunk." Brooks radioed Department of Public Safety Trooper Michael Adcock, who was coming to assist with the disturbance call, and gave him a description of Webster's car and his suspected direction of travel.

Brooks located Webster leaving a tire shop and observed him drive a few hundred feet. Webster then entered a convenience store parking lot near the Fairfield city limits. Brooks pulled into the lot. As Webster walked to the store entrance, Brooks asked him to stop and come talk to him. Webster entered the store. Brooks

---

1. The Court of Criminal Appeals thoroughly explained the meaning of "horizontal gaze nystagmus" and the testing procedures for measuring this condition in *Emerson v. State*, 880 S.W.2d 759, 765–67 (Tex.Crim.App. 1994). In short, the term refers to the inability of the eyes to smoothly follow an object moving horizontally across the field of vision, particularly when the object is held at an angle of 45° or more to the side. *See id.;* NATIONAL HIGHWAY TRAFFIC SAFETY ADMIN., U.S. DEP'T OF TRANSP., DWI DETECTION AND STANDARDIZED FIELD SOBRIETY TESTING, STUDENT MANUAL VIII—12–15 (1995) (hereinafter, the "1995 NHTSA Manual"). The consumption of alcoholic beverages has been shown to exacerbate this naturally-occurring condition. *See Emerson*, 880 S.W.2d at 766; 1995 NHTSA MANUAL at VIII—12.

approached him at the register and asked him to come outside. Webster began arguing with Brooks, so the latter took him by the arm and escorted him outside. Brooks recalled that Webster had a strong odor of an alcoholic beverage on his breath, bloodshot eyes, slurred speech, and other symptoms suggesting that he was intoxicated. Webster repeatedly stated that he was on morphine and was not "drunk."

After Brooks escorted Webster from the store, Trooper Adcock administered an HGN test. Adcock testified that Webster demonstrated the maximum six "clues" [2] of intoxication during the test. Webster informed the officers that he was physically unable to perform the one-leg stand test. Accordingly, they placed him under arrest for driving while intoxicated and transported him to the county jail.

### HGN TESTING

Webster argues in his first issue that the court erred by admitting the results of his HGN test because Trooper Adcock failed to screen him "for factors other than alcohol that potentially contribute to or cause nystagmus" before administering the test. He contends in his second issue that the court erred by denying his motion for mistrial after Adcock testified about the National Highway Transportation Safety Administration's (the "NHTSA") finding of a correlation between HGN test results and blood-alcohol concentration.

Adcock testified that he is certified by DPS to conduct this test. Webster's counsel took Adcock on voir dire at this point to inquire about whether he had asked Webster questions about his medical con-

dition or any medications he might be taking prior to administering the test. Adcock responded that the testing procedures themselves are designed to screen for these things:

> It was part of the test, yes. I looked at the size of his pupils and if his eyes tracked the same. His left eye tracked the same as the right eye. And I did not see any indications there was any neurological or any other disorder that might clue me in to that it wasn't anything other than alcohol or some kind of drug.

Webster objected to the admission of Adcock's testimony on the HGN test because Adcock failed to conduct any screening *before* administering the test. The court overruled the objection.

Adcock testified that Webster demonstrated the maximum six "clues" of intoxication during the test. The prosecution then asked him how many of these clues the (NHTSA) has determined are necessary "to indicate that he would have a blood alcohol content that would make him legally intoxicated for driving purposes." Adcock responded, "Four clues would give about a[sic] 75 percent test subjects being over 0.10 blood alcohol concentration." [3]

Webster objected to this testimony on the basis that the State was attempting to correlate the results of his HGN test to a precise blood-alcohol concentration as prohibited by the Court of Criminal Appeals in *Emerson v. State.* 880 S.W.2d 759, 769 (Tex.Crim.App.1994). After reviewing *Emerson,* the court sustained Webster's objection, instructed the jury to disregard

---

**2.** In conducting the HGN test, an officer looks for three so-called "clues" with each eye. 1995 NHTSA MANUAL at VIII—17; *see also Emerson,* 880 S.W.2d at 766. They are: (1) the eye cannot follow a moving object smoothly; (2) distinct nystagmus when the eye is at maximum deviation; and (3) an onset of nystagmus before the eye has moved 45 degrees to the side. *Id.* The State included only selected portions of the 1995 NHTSA Manual in the appendix to its brief. Never-

theless, we take judicial notice of the entirety of the document. *See Emerson,* 880 S.W.2d at 764–65.

**3.** According to the 1995 NHTSA manual however, 77 percent of subjects with four or more clues were found to have an alcohol concentration in excess of 0.10. 1995 NHTSA MANUAL at VIII—17.

this testimony, and denied Webster's motion for mistrial.

In *Emerson,* the Court of Criminal Appeals set the standard for the admission of HGN results in Texas under the former Rule of Criminal Evidence 702. *See Emerson,* 880 S.W.2d at 763; Tex.R.Crim. Evid. 702. The Court established the following test:

> For testimony concerning a defendant's performance on the HGN test to be admissible, it must be shown that the witness testifying is qualified as an expert on the HGN test, specifically concerning its administration and technique. In the case of a police officer or other law enforcement official, this requirement will be satisfied by proof that the officer has received practitioner certification by the State of Texas to administer the HGN. A witness qualified as an expert on the administration and technique of the HGN test may testify concerning a defendant's performance on the HGN test, but may not correlate the defendant's performance on the HGN test to a precise [blood-alcohol concentration].

*Emerson,* 880 S.W.2d at 769. Because the present Rule of Evidence 702 is identical to the former criminal rule, we believe that *Emerson* applies with equal force under the present rule. *Compare* Tex.R. Evid. 702 *with* Tex.R.Crim. Evid. 702.

■ The Court noted in *Emerson* that the NHTSA testing procedures require the "officer to screen the suspect for factors such as corrective lenses, brain damage, medical disorders, or blindness, which could lead potentially to an incorrect determination as to whether the suspect is intoxicated." *Emerson,* 880 S.W.2d at 766 (citing National Highway Traffic Safety Admin., U.S. Dep't of Transp., DWI Detection and Standardized Field Sobriety Testing, Student Manual VIII—14–15

4. In *Emerson,* the Court relied on the 1992 version of the NHTSA Manual. *See Emerson,* 880 S.W.2d at 766. We refer hereinafter to the 1992 version as the "1992 NHTSA Manu-

(1992)).[4] Concerning this screening, the Court later noted that the NHTSA testing procedures "require an officer to screen for factors other than alcohol that potentially contribute to, or cause, nystagmus, such as other drugs, neurological disorders, and brain damage, *prior to administering the HGN test." Id.* at 768 (emphasis added).

■ Webster contends in his first issue that this last-quoted sentence from *Emerson* clearly requires that an officer administering an HGN test must first conduct a separate screening procedure to eliminate any other potential causes for nystagmus which the test might reveal. Because the plain language of the 1992 NHTSA Manual and the 1995 edition currently in use do not require a separate pre-test screening procedure, we disagree.

The 1992 NHTSA Manual provided in pertinent part the following concerning screening for other potential causes of nystagmus:

*Specific Procedures*

Begin by asking "are you wearing contact lenses". There is only a very slight chance that contact lenses might interfere with the HGN test. But, it is wise to make a note of the fact that the suspect wears contacts before starting the test.

If the suspect is wearing eyeglasses, have them removed.

Give the suspect the following instructions from a position of interrogation (that is, with your weapon away from the suspect):

● "I am going to check your eyes."

● "Keep your head still and follow this stimulus with your eyes only."

● "Keep focusing on this stimulus until I tell you to stop."

al." Although the parties have not provided a copy of the 1992 NHTSA Manual, we take judicial notice of its contents. *See id.* at 764–65.

Check the suspect's eyes for the ability to track together. Move the stimulus smoothly across the subject's entire field of vision. Check to see if the eyes track the stimulus together or one lags behind the other. If the eyes don't track together it is possibly caused by a medical disorder or injury, or blindness.

Next, check to see that both pupils are equal in size. If they are not, this may indicate a head injury.

. . . .

NOTE: Nystagmus may be due to causes other than alcohol. These other causes include seizure medications, phencyclidine inhalants, barbiturates, and other depressants. A large disparity between the performance of the right and left eye may indicate brain damage.

1992 NHTSA Manual at VIII—13–15.

The 1992 Manual also contains the following checklist of procedures to follow:

ADMINISTRATIVE PROCEDURES

1. EYEGLASSES/CONTACTS
2. VERBAL INSTRUCTIONS
3. POSITION OBJECT (12–15 INCHES)
4. TRACKING
5. PUPIL SIZE
6. CHECK FOR LACK OF SMOOTH PURSUIT
7. CHECK FOR DIST. NYSTAGMUS @ MAX. DEV.
8. CHECK ONSET OF NYSTAGMUS PRIOR TO 45°
9. TOTAL THE CLUES
10. CHECK FOR VERTICAL NYSTAGMUS

*Id.* at VIII—15.

The first, third, and fourth paragraphs quoted above have been modified slightly in the 1995 version of the NHTSA Manual. Those provisions currently read as follows:

*Specific Procedures*

Begin by asking "are you wearing contact lenses", make a note whether or not the suspect wears contacts before starting the test.

. . . .

Give the suspect the following instructions from a position of interrogation (FOR OFFICER SAFETY KEEP YOUR WEAPON AWAY FROM THE SUSPECT):

● "I am going to check your eyes."
● "Keep your head still and follow this stimulus with your eyes only."
● "Keep focusing on this stimulus until I tell you to stop."

Position the stimulus approximately 12–15 inches from the suspect's nose and slightly above eye level. Check the suspect's eyes for the ability to track together. Move the stimulus smoothly across the suspect's entire field of vision. Check to see if the eyes track the stimulus together or one lags behind the other. If the eyes don't track together it could indicate a possible medical disorder, injury, or blindness.

National Highway Traffic Safety Admin., U.S. Dep't of Transp., DWI Detection and Standardized Field Sobriety Testing, Student Manual VIII—15–16 (1995). Although there are other variations between the testing procedures delineated in the 1995 Manual and those in the 1992 version, those quoted above constitute the entirety of the variances between the manuals regarding HGN screening procedures. *Compare* 1995 NHTSA Manual at VIII—14–17 *with* 1992 NHTSA Manual at VIII—13–15.

As Trooper Adcock explained, the 1995 NHTSA Manual requires an officer to screen a suspect for other potential causes of nystagmus as he is conducting the HGN test. The officer does so by checking for: (1) whether the eyes track the stimulus together; (2) whether the left and right pupils are the same size; and (3) whether a significant disparity exists between the performances of the left and right eyes. 1995 NHTSA Manual at VIII—16–17. The only true pre-test screening required

is for the officer to inquire whether the suspect is wearing contact lenses, and Webster does not contend that Trooper Adcock failed to comply with this requirement. *See id.* at VIII—15.

Because Trooper Adcock testified that he checked Webster for the three indicators noted above as he performed the HGN test, we conclude that he performed the screening required by the 1995 NHTSA Manual. Thus, the court did not abuse its discretion in overruling Webster's objection. Accordingly, we overrule his first issue.

Webster avers in his second issue that the court abused its discretion by denying his motion for mistrial after instructing the jury to disregard Adcock's testimony concerning the NHTSA's finding that "about 77%" of test subjects with four or more HGN "clues" will have blood-alcohol concentrations in excess of 0.10. *See id.* at VIII—17. The State responds in part that any error in this regard was rendered harmless by Adcock's subsequent cross-examination which elicited virtually identical testimony without objection.

■ Settled case law establishes that any error in the admission of evidence is generally rendered harmless when similar evidence is admitted without objection. *Leday v. State,* 983 S.W.2d 713, 718 nn. 6–7 (Tex.Crim.App.1998). An exception to this general rule occurs however when the accused offers evidence in an effort "to meet, destroy, or explain" the complained-of testimony. *Id.* at 719; *McGlothlin v. State,* 896 S.W.2d 183, 189 n. 9 (Tex.Crim. App.1995).

■ The prosecutor asked Adcock how many clues from the HGN test are necessary "to indicate that [a suspect] would have a blood alcohol content that would make him legally intoxicated for driving purposes." Adcock responded, "Four clues would give about a[sic] 75 percent test subjects being over 0.10 blood alcohol concentration." On cross-examination, Webster's counsel asked Adcock whether

he believed that this percentage "is good enough to tell [him] this person is in fact under the influence." We view this cross-examination as an effort to discredit the reliability of the HGN test, particularly because it was the only standardized field sobriety test performed on Webster. Accordingly, we conclude that this cross-examination fits within the exception to the general rule reiterated in *Leday. Id.*

■ In the question above, the prosecutor essentially asked Adcock to correlate Webster's performance on the HGN test to a conclusion that his blood-alcohol concentration exceeds the legal limit. This constitutes an impermissible attempt to estimate Webster's blood-alcohol concentration on the basis of his test results. *See Emerson,* 880 S.W.2d at 769; *Youens v. State,* 988 S.W.2d 404, 405–06 (Tex.App.— Houston [1st Dist.] 1999, no pet.). Because the court sustained Webster's objection to this testimony and instructed the jury to disregard it, we must determine whether the court abused its discretion in denying his motion for mistrial. *See Ovalle v. State,* 13 S.W.3d 774, 783 (Tex. Crim.App.2000) (per curiam).

■ A prompt instruction to disregard generally renders harmless any error arising from improperly-admitted testimony. *Id.* This is so "except in extreme cases where it appears that the evidence is clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on their minds." *Ladd v. State,* 3 S.W.3d 547, 567 (Tex. Crim.App.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000) (quoting *Gardner v. State,* 730 S.W.2d 675, 696 (Tex.Crim.App.1987)). To determine whether this narrow exception applies, we must examine "the peculiar facts and circumstances of each case." *Hernandez v. State,* 805 S.W.2d 409, 414 (Tex.Crim.App.1990); *accord Hinojosa v. State,* 4 S.W.3d 240, 253 (Tex.Crim.App. 1999).

The indictment does not allege that Webster was intoxicated by having a blood-alcohol concentration in excess of 0.10. The State did not mention blood-alcohol concentration during voir dire, during any other witness's testimony, or in closing argument. For these reasons, we conclude that the court's instruction to disregard Trooper Adcock's testimony about the correlation between HGN test results and blood-alcohol concentration rendered the admission of that testimony harmless. *See Ovalle,* 13 S.W.3d at 783–84. Accordingly, the court did not abuse its discretion by denying Webster's motion for mistrial. *Id.* at 783. Therefore, we overrule Webster's second issue.

## LAY OPINION TESTIMONY

■ Webster claims in his third issue that the court erred by allowing his former wife to provide lay opinion testimony that he was intoxicated because of a combination of alcohol and medication. The pertinent testimony is as follows:

PROSECUTOR: What effect does. drinking have with his medication he's been taking?

DEFENSE COUNSEL: I'm going to object, Your Honor. She has no medical background. She can't testify.

PROSECUTOR: What have you observed happen when he drinks with the medication he's taking?

THE COURT: You may answer.

VICKI: He becomes blown. I mean, he's really uncontrollable on some medications that I've seen.

PROSECUTOR: And have you asked him on many occasions not to drink and not to drink with medication?

VICKI: Yes, I have.

PROSECUTOR: And has he refused to do that?

VICKI: Pretty much so, yeah.

. . . .

PROSECUTOR: You know him when he's sober and you know him when he's intoxicated. Is that correct?

VICKI: Correct.

PROSECUTOR: And based on your observation of him on July the 17th, at about 3:00, give or take a little while, was he or was he not intoxicated?

VICKI: He was intoxicated.

■ Rule of Evidence 701 permits the admission of lay opinion testimony when the witness's opinion is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." TEX.R. EVID. 701; *Fairow v. State,* 943 S.W.2d 895, 898 (Tex. Crim.App.1997). To satisfy the first of these requirements, the proponent of the witness's testimony must show that the witness has personal knowledge of the events on which his opinion is based and that this opinion is "rationally based on that knowledge." *Fairow,* 943 S.W.2d at 898.[5] The decision to admit lay opinion testimony rests within the sound discretion of the trial court and will be reversed only for an abuse of that discretion. *Id.* at 901.

The first question quoted above establishes that Vicki's opinion was based on events she has personally witnessed. Thus, the first requirement of *Fairow* is satisfied. *Id.* at 898–99. Concerning the second requirement, the Court stated, "An opinion is rationally based on [a witness's personal observations] if it is an opinion that a reasonable person could draw under the circumstances." *Id.* at 900. Considering the nature of the testimony and Vicki's

5. As with *Emerson, supra,* the Court of Criminal Appeals in *Fairow* was interpreting the former criminal rule of evidence. However, because the former and current rule are substantively identical, we presume that the same analysis continues to apply.

relationship with Webster, we conclude that her opinion was rationally based on her prior observations. Accordingly, the second requirement is satisfied. *Cf. id.* at 900.

The parties do not dispute that Vicki's opinion goes to a disputed fact issue, namely whether Webster was intoxicated as alleged in the indictment "by not having the normal use of mental and physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, or a combination of two or more of those substances into [his] body." Thus, her opinion testimony satisfies the requirement of Rule 701(b) that the opinion be "helpful to ... the determination of a fact in issue." TEX.R. EVID. 701(b); *Fairow*, 943 S.W.2d at 900.

For these reasons, we overrule Webster's third issue.

We affirm the judgment.