Affirmed and Memorandum Opinion filed March 8, 2011.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-09-00845-CR

___________________

 

Misti Lea Thompson, Appellant

 

V.

 

The State of Texas, Appellee



 



 

On
Appeal from the 208th District Court

Harris County,
Texas



Trial Court Cause No. 1154575

 



 

 

MEMORANDUM OPINION

A jury found appellant Misti Lea
Thompson guilty of capital murder and sentenced her to thirty-seven years’
imprisonment.  Thompson appeals her conviction contending that: (1) the trial
court erred in admitting testimony that she was under the influence of narcotics
during the hours immediately preceding the murder, and (2) the trial court erred
in admitting a crime-scene investigator’s testimony on the estimated time of the
complainant’s death.  We affirm.  

I

Misti Lea Thompson was convicted of killing Christopher
Peltier, her boyfriend and the father of their two children, in the early
morning hours of January 13, 2007.  It was undisputed at trial that Thompson
shot Peltier in the head in their home.  Thompson, however, claimed she shot Peltier
in self-defense after he hit her and advanced toward her with a knife.  

Thompson and Peltier spent several hours the previous
night and into the morning drinking with friends.  The couple met around 9:15
p.m. at Perry’s Steakhouse, where Peltier worked, and, according to Thompson,
went to two other restaurants before arriving at John’s Bar around 11:00 p.m.  Peter
Villars, Peltier’s friend and co-worker, testified he was with the couple at
John’s Bar.  According to Villars, Thompson and Peltier were drinking beer and
having fun.  Villars testified Thompson had a low tolerance for alcohol and
began talking openly of a surgical procedure that had recently been performed
on her breasts.  She then began showing her breasts to patrons and inviting
people to touch them.  Peltier apparently did not object to this behavior.  Villars
testified that Thompson and Peltier left John’s Bar around 1:15 a.m.  An
argument then broke out between the two while driving in Thompson’s truck,
which ended with Peltier exiting the truck and walking roughly a quarter-mile
to friend Trey Weaver’s house.  

Weaver testified Peltier showed up at his house
around 1:15 a.m. and was “a little agitated.”  Weaver testified Peltier said he
had been arguing with Thompson in the truck because she was intoxicated and was
swerving in the road but would not let him drive.  Peltier asked Weaver to
drive him to pick up his truck at Perry’s Steakhouse.  After retrieving the
truck, they returned to Weaver’s house in the hope that Thompson would have
arrived there.  After they discovered she had not, Weaver testified Peltier
left shortly before 2:00 a.m.   

After parting ways with Peltier, Thompson drove to
Tobin’s Sports Bar, where she met with several acquaintances including Chris
Lane, Amy Alexander, and Tanya Beaton.  Lane testified that Thompson was intoxicated
and acted “manically happy.”  According to Lane, Thompson spilled a drink on
Amy Alexander’s chest and licked it off.  Lane further testified that Thompson
bit him on the arm for no apparent reason.  The jury was shown a picture Lane
had taken of the wound.  Lane testified over objection that based on his 15
years of experience in the restaurant industry, Thompson’s behavior was
“[c]onsistent with more than alcohol in her system.”  Alexander testified
Thompson was “pretty intoxicated” and acting “angry, upset, and aggressive.” 
She testified Thompson said she was upset with Peltier because he had forgotten
her upcoming birthday, and that Peltier had gotten out of her truck while they
were fighting.  Alexander testified she understood from the discussion that Peltier
was upset because he thought Thompson was too intoxicated to drive.  Tanya
Beaton testified Thompson asked her if she knew where to get cocaine.  

Alexander testified she called Peltier at Weaver’s
house twice between 2:00 a.m. and 2:30 a.m. to express her concern about
Thompson’s decision to drive after the bar closed.  Peltier responded that he
was on his way home.  Weaver testified that he received a call from the Peltier
around 3:00 a.m. reporting he was home safely.  Weaver said he could hear
Thompson in the background and that she sounded “a little excited.”     

Police were dispatched to the home shortly after 4:00
a.m. after Thompson called 911 and told the dispatcher she had shot Peltier after
he hit her and attacked her with a knife.  Harris County Deputy Constables
Terry Davenport and Michael Cantu were the first to arrive at the scene. 
Deputy Davenport testified that Thompson was “half-clothed,” wearing panties
and a t-shirt, “pacing a lot” and “yelling and just kind of rambling on.” 
According to Deputy Davenport, Thompson said that “she had shot him and she
thinks he’s dead.”  Deputy Cantu testified Thompson said, “I had to shoot him. 
He made me do this.  He came at me with a knife.  He has been abusing me for a
long time.”  

Thompson was placed in a patrol car and the deputies
entered the house to find Peltier’s body face down between the bathroom and
closet in the master bedroom.  A knife was lying on the ground next to the Peltier’s
body.  Sergeant Larry Davis and Crime Scene Investigator Gary Clayton of the Harris
County Sheriff’s Office investigated the scene.  Investigator Clayton testified
it appeared that, based on the lividity of the body, Peltier died more than an
hour before his arrival at 5:15 a.m.  Both Sergeant Davis and Investigator
Clayton testified it did not appear the knife fell from Peltier’s hand because
it lay with the blade toward the body while Peltier’sleft hand was beneath his
body.  Investigator Clayton further testified he did not see signs of a struggle
in the home.  According to Investigator Clayton, a hole in the bedroom door and
in the wall in the living room appeared to be old damage.[1]  Sergeant Davis
testified he did not see bruises, scrapes, or any other visible marks on
Thompson.  Investigator Clayton testified the only marks he saw on Thompson
were some bruising on her wrists that he believed came from the handcuffs. 
Sergeant Davis further testified that it appeared someone had staged the scene
with the knife and an apparently broken remote control to create the appearance
of a struggle.  

Thompson and her attorney participated in a
videotaped “walk-through” of the crime scene with Sergeant Davis.  Thompson did
not mention the knife in the walk-through, instead claiming Peltier had nothing
in his hands when he lunged at her.  She also stated that Peltier had created
the holes in the wall and door the night of the shooting although Sergeant
Davis testified the damage appeared old.  Sergeant Davis further testified that
Thompson’s description of the events in the walk-through was inconsistent with
the manner in which they found Peltier’s body.  Furthermore, Sergeant Davis
testified that Thompson’s statement that she arrived home around 2:00 a.m. was
inconsistent with phone records showing Thompson had called the home phone from
her cell phone at 2:44 a.m. and called the Peltier’s cell phone at 2:37 a.m. and
3:04 a.m.  

Several of Peltier’s and Thompson’s acquaintances who
were with them the night before the shooting testified to Peltier’s peaceable
character.  Villars, who had known Peltier for about two years, said he had
never seen him angry or “get into it” with a customer.  Villars described Peltier
as a “good dad” who “loved his daughters.”  Villars testified he never heard Peltier
raise his voice at Thompson.  Lane, who had worked with Peltier for about eight
months, testified he had never seen him “lose his cool” and that he had a
“peaceful” character.  Alexander testified the Peltier was “very nice” and “definitely
wasn’t a troublemaker.”  Beaton described the Peltier as an “it-is-what-it-is”
kind of guy.  The State also called Tanya Duplechain, the mother of one of
Peltier’s other children, as a rebuttal witness.  Duplechain testified Peltier
was a “good guy” who never hit her or displayed any aggression toward her.       

Thompson took the stand and testified she and Peltier
began to argue in her truck after leaving John’s Bar.  She stated that both she
and Peltier were intoxicated and that he attempted to get out of the moving
truck.  Thompson testified she left him and drove to Tobin’s Sports Bar angry
but cooled off quickly.  She left Tobin’s Sports Bar for home after 30 to 45
minutes but found Peltier was not there.  Thompson then called Peltier, who
said he was on the way home.  Upon his arrival, the couple resumed arguing and
Thompson testified Peltier grabbed her wrist, spun her around, and started
yelling in her face, after which she fled into the bedroom and slammed the
door.  Thompson testified Peltier came in the bedroom looking angry and holding
something shiny in his hand.  Thompson then ran into the closet and shut the
door, placing her weight against the door to keep Peltier out.  She also retrieved
a gun that was in her purse in the closet.  According to Thompson, Peltier then
forced open the door, causing her to fall back against a laundry hamper, and as
Peltier lunged toward her she raised the gun and shot him.  Thompson denied
taking or seeking any drugs on the night leading up to the shooting.  

On cross-examination, the State pointed out that
Thompson told police during the videotaped walk-through that she and Peltier returned
together from Tobin’s Sports Bar around 2:00 a.m., which conflicted with
Thompson’s testimony that she went to Tobin’s Sports Bar alone and returned
home after 2:00 a.m. and prior to Peltier’s arrival.  The State also established
Thompson had testified to the grand jury that she went looking for Peltier
after he got out of her truck but told police during an interview the day of
the shooting that she did not.  Thompson was also impeached with phone records
showing a call to her cell phone from their house phone at 2:43 a.m., although
she claimed she was home shortly after 2:00 a.m. and Peltier did not arrive
home until after 3:00 a.m.  Thompson attributed the discrepancies to confusion. 
She was also asked to explain how she ended up against the right wall of the
closet when the direction in which the closet door opened would have pushed her
toward the back of the closet.  Thompson testified she was not sure because the
incident happened so fast.  

After hearing all the evidence, the jury convicted
Thompson of murder and sentenced her to thirty-seven years’ confinement.  This
appeal followed.  

II

A

In her first issue, Thompson complains that the trial
court erred in allowing Chris Lane to testify that Thompson’s behavior was “[c]onsistent
with more than alcohol in her system.”  Lane based his opinion on his fifteen
years of experience in the restaurant business, during which time he had
witnessed “people and guests” under the influence of alcohol and narcotics.  Thompson
argues Lane was not qualified under Texas Rule of Evidence 702 to testify as a
drug-recognition expert, and that his testimony, coupled with Tanya Beaton’s
testimony that Thompson asked her where she could find cocaine, improperly
suggested that Thompson was under the influence of cocaine.  Because cocaine is
a stimulant known to induce aggressive behavior, Thompson argues, the
suggestion raised by Lane’s testimony undermined her self-defense claim.  

We review the trial court’s decision using an
abuse-of-discretion standard.  Fairow v. State, 943 S.W.2d 895, 901
(Tex. Crim. App. 1997).  If evidence supports the trial court's decision to
admit evidence, then there is no abuse of discretion, and the appellate court
must defer to the trial court’s decision.  Osbourn v. State, 92 S.W.3d
531, 538 (Tex. Crim. App. 2002) (citing Powell v. State, 63 S.W.3d 435,
438 (Tex. Crim. App. 2001)); Fairow, 943 S.W.2d at 901.  The question of
whether a witness offered as an expert possesses the required qualifications
rests largely in the trial court’s discretion.  Wyatt v. State, 23
S.W.3d 18, 27 (Tex. Crim. App. 2000).  Absent a clear abuse of that discretion,
the trial court’s decision to admit or exclude testimony will not be disturbed.
 Id.

Thompson claims that case law is “rife” with
discussions of the qualifications necessary to qualify a witness as an expert
on drug recognition, but cites to only one unreported opinion in her brief:  Bumgarner
v. State, No. 12-05-00243-CR, 2006 WL 1917961 (Tex. App.—Tyler July 12, 2006,
pet. ref’d) (mem. op., not designated for publication).  The State, on the
other hand, does not argue Lane was qualified as an expert witness but instead contends
Lane’s statement was permissible as lay-opinion testimony under Texas Rule of
Evidence 701 and the two-pronged analysis advanced in Fairow.  943
S.W.2d at 898.  The first prong of the Fairow test requires that “the
witness must establish personal knowledge of the events from which his opinion
is drawn and . . . the opinion drawn must be rationally based on that
knowledge.”  Id.  The second prong requires that the testimony be
helpful to the jury to understand the testimony and determine a fact issue. 
Id.  

The State argues the first prong was met because
Lane’s fifteen years in the restaurant business granted him occasion to frequently
observe patrons under the effects of alcohol and other intoxicants. 
Furthermore, the State argues Lane’s opinion was based on his personal
experiences with Thompson, a person he had seen socially in the past.  The
second prong is satisfied, the State argues, because it aids the jury in
determining the reasonableness of Thompson’s contention that she felt she was
in danger from Peltier.  

The State also likens this case to several in which
courts have upheld the admissibility of lay-opinion testimony on intoxication. 
See Webster v. State, 26 S.W.3d 717, 724–25 (Tex. App.—Waco 2000, pet.
ref’d) (wife permitted to proffer lay opinion regarding husband’s intoxication
by alcohol and medication); State v. Welton, 774 S.W.2d 341, 343–44
(Tex. App.—Austin 1989, pet. ref’d) (police officer permitted to give lay
opinion regarding intoxication); Richardson v. State, 766 S.W.2d 538,
540 (Tex. App.—Houston [14th Dist.] 1989, pet. ref’d) (holding any lay witness
may give an opinion as to intoxication); Howard v. State, 744 S.W.2d
640, 641 (Tex. App.—Houston [14th Dist.] 1987, no pet.) (same).  

Thompson points out that Lane did not simply testify
that Thompson was intoxicated.  Rather, he opined that Thompson had “more than
alcohol” in her system; that she was not merely drunk but also high on
cocaine.  At least one case suggests it is possible, under Rule 701, for a lay
witness to testify as to the source of intoxication if the requirements imposed
by Fairow are otherwise satisfied.  In Webster v. State, the
court held admissible a wife’s testimony that she knew from his behavior when
her husband had been mixing alcohol and his prescription medications.  Webster,
26 S.W.3d at 724–25.  

However, we need not decide whether Lane’s testimony was
admissible because defense counsel failed to preserve error through a timely
objection to the potentially inadmissible testimony.  The following exchange
took place during the testimony in question:  

Q.  Sir, you — Mr. Lane, how long have you been in the
restaurant business?

A.  I was in the restaurant business for, on and off, 15
years.  

Q.  And on few or many occasions have you seen people
intoxicated from drinking alcohol?

A.  Several.  Several occasions. 

Q.  All right.  Have you ever seen anyone under the
influence of drugs other than alcohol?  

            MS. MILLER:  Objection, Your Honor.  He’s not
qualified to          answer that question.  Calls for speculation.

            THE COURT:  Overruled.  

Q.  (BY MR. REISS) You may answer that question, sir.  

A.  I have seen the effects of drugs and alcohol on people
and guests.

Q.  Okay.  Can you describe the difference, please.  

A.  Under alcohol, it’s usually sedate, or angry, or just
very one-sided.  With drugs introduced, it’s usually — oscillates back and
forth much quicker and much more energy.  

Q.  And how would you characterize Misti’s [appellant’s] behavior
at the bar?

A.  Consistent with more than alcohol in her system.  

A defendant claiming a trial
judge erred in admitting evidence must preserve the error by a proper objection
and a ruling on that objection.  Martinez v. State, 98 S.W.3d 189, 193
(Tex. Crim. App. 2003).  Texas Rule of Appellate Procedure 33.1(a) states that
a prerequisite to preserving error on appeal is that the record show the
“complaint was made to the trial court by a timely request, objection, or
motion that [states] the grounds for the ruling that the complaining party
sought from the trial court with sufficient specificity to make the trial court
aware of the complaint, unless the specific grounds were apparent from the
context.”  It is also established that a proper objection that has been
overruled “will not result in reversal when other such evidence was received
without objection, either before or after the complained-of ruling.”  Leday
v. State, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998).  

This requirement to preserve error has given rise to
the so-called “contemporaneous objection rule,” which requires a party to
continue to object each time inadmissible evidence is offered.  See
Ethington v. State, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991) (quoting Hudson
v. State, 675 S.W.2d 507, 511 (Tex. Crim. App. 1984)).  There are two
exceptions to the contemporaneous-objection rule.  The first is to request a
“running” objection and receive a ruling on that request from the trial court. 
Id.  The second is to properly object to all objectionable testimony on
a given subject at one time out of the jury’s presence and obtain a ruling on
the objection.  Id.  

Defense counsel’s lone objection was insufficient to
preserve error, and neither exception to the contemporaneous-objection rule was
implicated. The question to which counsel objected was whether Lane had ever
seen anyone under the effects of drugs other than alcohol.  This question was
not confined to Lane’s work experience, did not ask for Lane to contrast the
typical reaction to alcohol versus drugs, and did not elicit Lane’s opinion as
to the source of Thompson’s intoxication.  The gist of the question was
whether, in his personal experience, had Lane ever known anyone to be under the
influence of drugs—a question that does not necessarily call for speculation
and certainly does not demand expert qualification.  Defense counsel failed to
object when more specific questions were asked of Lane concerning the effect of
different types of intoxications and his opinion of the source of Thompson’s
intoxication.[2] 
Defense counsel’s initial objection was insufficient to preserve error
throughout the line of questions and answers that followed, and we therefore conclude
the issue has been waived.  See Ethington, 819 S.W.2d at 858; Richardson,
766 S.W.2d at 540.  Thompson’s first issued is overruled.  

B

In her second issue, Thompson complains that the
trial court erred in allowing a police officer to testify to the time of Peltier’s
death based on the appearance of lividity in his body.[3]  Gary Clayton, a
deputy and crime-scene investigator with the Harris County Sheriff’s Office, did
not give a time of death but testified that the presence and degree of lividity
indicated death had occurred over an hour before he first observed the body. 
Defense counsel objected to the testimony as calling for a “medical
conclusion.”  As in Thompson’s first issue, we review the trial court’s ruling
under an abuse-of-discretion standard.  

On appeal, Thompson complains that Investigator
Clayton was not qualified as an expert under Texas Rule of Evidence 702 to offer
the opinion that Peltier’s death occurred more than one hour before his
examination based on the presentation of lividity in his body.  Thompson
acknowledges that case law supports the admissibility of testimony by a police
officer as to presence of lividity in the body.  See Amunson v. State,
928 S.W.2d 601, 606 (Tex. App.—San Antonio 1996, pet. ref’d).  However, Thompson
argues case law does not support the admissibility of testimony from a police
officer that draws a medical conclusion as to time of death based on the
presence and appearance of lividity.  

Although police officers typically testify as
qualified experts under Rule 702, an officer may also be considered a lay
witness under Rule 701.  See Osbourn, 92 S.W.3d at 536–37.  In Yohey
v. State, 801 S.W.2d 232, 242–43 (Tex. App.—San Antonio 1990, pet. ref’d),
a police officer testified that a murder victim was “clammy cold” when he
arrived at the scene.  The officer testified that based on the temperature of
the body the death had not occurred within the hour.  The officer’s assessment
was based on the temperature of the body, his training, and the “many occasions”
in which he had arrived at shooting scenes immediately after the victim had
been shot.  The court held the officer’s testimony admissible under both Rule
701 and 702.  Yohey, 801 S.W.2d at 243.  

Investigator Clayton testified he had worked for
eleven years as a crime-scene investigator, during which he had amassed
extensive training and experience.  His training included several classes
conducted by physicians in the Harris County Medical Examiner’s Office in which
instruction was provided on the approximate times for lividity and rigor mortis
to set in on a corpse.  Investigator Clayton testified he regularly attended
medical conferences in which information was provided on lividity as a
beginning stage of decomposition.  Additionally, Investigator Clayton testified
he had “a file cabinet full of [homicide] scenes” and had “easily” seen
hundreds of homicide victims.  Investigator Clayton’s testimony was admissible
under both Texas Rules of Evidence 701 and 702.  His testimony was admissible
under Rule 701 because it is based on first-hand knowledge, and his testimony
was admissible under Rule 702 because it was based on his training and
experience.  See id.  We hold the trial court did not abuse its
discretion in admitting Deputy Clayton’s testimony.  Thompson’s second issue is
overruled.    

* * *

For the
foregoing reasons, we affirm the trial court’s judgment.

                                                            

                                                                                    

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

 

 

Panel consists of Justices Anderson,
Frost, and Brown.  

Do
Not Publish — Tex. R. App. P. 47.2(b).









[1] Weaver testified he had
previously seen the damage to both the bedroom door and living-room wall.  





[2] We note that when the
State attempted to elicit similar testimony from Alexander concerning the
differences in behavior between persons under the influence of alcohol versus
narcotics, defense counsel timely objected and the trial judge sustained the objection. 






[3] “Lividity” refers to the
pooling of blood after death at the lowest point of gravity in the body,
casting a blue or purple tint on the skin.