

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00105-CR

_____

TIMOTHY PAUL BATES, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 2
Hunt County, Texas
Trial Court No. CR1301437

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

MEMORANDUM OPINION

Following a May 13, 2014, jury trial, Timothy Paul Bates was convicted of driving while intoxicated (DWI). Pursuant to a plea agreement between Bates and the State, the trial court sentenced Bates to 180 days' confinement in the Hunt County jail, suspended the sentence, placed Bates on twelve months' community supervision, and fined him $400.00. Bates appeals his conviction, arguing that the evidence is legally insufficient to prove beyond a reasonable doubt that he committed the offense of DWI.

We overrule Bates' sole point of error because we find that legally sufficient evidence supports his conviction. Consequently, we affirm the trial court's judgment.

## I.   Legally Sufficient Evidence Supports Bates' Conviction

On September 1, 2013, at approximately 1:30 a.m., Bates walked into the Kwik-Check Convenience Store (the Store) on Wesley Street in Greenville, Texas. Philip Erickson was the clerk working at the Store that morning, and according to Erickson, something was "not right" with Bates. Erickson testified that Bates seemed a "little wired," but that it was not unusual for customers to behave strangely at 1:30 a.m. Erickson's initial thoughts soon changed when Bates asked Erickson if he could buy "certain goods" for a highly inflated price. Erickson asked Bates if he was referring to alcohol, and Bates said "[Y]es." Erickson refused to sell alcohol to Bates because he believed he was prohibited by law, due to the time of day, from doing so. Following Erickson's refusal to sell alcohol to Bates, Bates, trying a different tack, said, "You know what sounds good to me is a fifty dollar candy bar." Erickson testified, "[H]e wanted me to sell him a

2

candy bar, ring up a candy bar, and let him walk out with the alcohol." Again, Erickson refused to comply with Bates' request.

According to Erickson, it was about this time that another customer entered the store. Bates then asked where the restroom was located, and Erickson told him that it was in the back of the store and to the left. Erickson noticed that while Bates was on his way to the restroom, he looked around the store in what Erickson believed was an attempt to "scope out" the security cameras. When Bates passed by the stock room, he also looked around at the "ceiling and "the walls." Bates then entered the restroom where he remained for a few minutes. Although Erickson did not smell alcohol on Bates, he believed he was "drunk or at least intoxicated" due to his strange behavior as well as the fact that he continued "pestering" Erickson to sell him alcohol. After assessing the situation and while Bates was in the restroom, Erickson contacted the nonemergency number for the local police department because he believed Bates was intoxicated and might be a danger to himself or others. Erickson testified that he did not call the nonemergency line very often.

When Bates emerged from the restroom, his pants were unfastened, and he was in the process of zipping them which, according to Erickson, was strange and highly unusual. Erickson testified that Bates walked around the store aimlessly until the other customer left. Bates then returned to the cash register with a Snickers candy bar in his hand and asked Erickson if he would be willing to sell the candy bar for fifty dollars. Again, Erickson refused his offer. Undeterred, Bates then asked if Erickson would agree to sell him some of the cardboard boxes in the stockroom for fifty dollars. When Erickson refused yet again, Bates asked, "Why? They won't be able to see what's inside the boxes on the cameras." At that point, Erickson asked Bates, "Are you even going

3

to buy the Snickers?" Bates replied affirmatively and handed Erickson money for the purchase. When Erickson was handing Bates his change, Bates lightly grazed Erickson's hand, leaned in close to him, looked him in the eyes, and said, "I would never put my hands on you except for just right now." Erickson then told Bates he needed to leave the store, and Bates complied.

Erickson testified that he was afraid of Bates because "you never know what someone who's intoxicated is capable of, things that they normally wouldn't do." When asked how he would describe Bates, he answered, "Being drunk was the closest I could describe how he was acting. I didn't smell any alcohol on his breath though. But just being -- being drunk was the closest I could describe it." Erickson did not notice Bates having glassy eyes or slurred speech, but he did notice that his body movements were "real fidgety" and that he was not walking straight. Erickson explained, "Just the way he was moving, it just seemed off." When asked if Erickson called law enforcement specifically because he was afraid of Bates, he responded,

> No. I called the cops before I felt scared. I was -- I was afraid, but not for myself. I was afraid that he was a danger to himself and other people out on the road. I didn't feel he should be driving. I called the cops because I thought he was intoxicated.

Erickson went on to testify that Bates came in the store a week to two weeks after the incident, but stated that Bates "came in the store and bought his stuff and just left."

In response to Erickson's telephone call to law enforcement, Greenville Police Officer Brandon West, came to the convenience store to speak with Erickson. Bates was leaving as West arrived, and Erickson was able to point out Bates' truck to West as Bates was exiting the store parking lot. West returned to his vehicle and followed Bates out of the parking lot for a short distance. Initiating an investigatory stop, West turned on his patrol car's strobe lights, and Bates

4

pulled over without incident. West initially asked Bates for his driver's license and proof of insurance and explained to him the reason for the stop. While talking to Bates, West leaned into the vehicle, but he did not smell the odor of alcohol in the vehicle or on Bates' person. West then asked Bates to exit the truck and proceed to the rear of the vehicle.

West informed Bates that he wanted to check his eyes. West began explaining the steps involved in the Horizontal-Gaze Nystagmus test (the HGN).[1] West explained the procedure more than once to Bates because West believed that Bates did not understand the instructions. West then noticed that the strobe lights on his patrol car were on and thought that perhaps the lights were distracting Bates and making it difficult for him to understand and comply with West's instructions. At that point, West returned to the patrol car, turned off the strobe lights, and then continued with his investigation.

After determining that Bates had equal tracking and equal pupil size,[2] West began the HGN. West testified that Bates was unable to follow the instructions because Bates would follow the tip of West's finger with his head instead of solely with his eyes as he had been instructed to do. West testified, "He was turning his head back and forth following and not doing as I had asked him to do." West recited the instructions three times before Bates was able to follow them

---

[1]Nystagmus is an involuntary rapid oscillation of the eyes in a horizontal, vertical, or rotary direction. *Emerson v. State*, 880 S.W.2d 759, 765 (Tex. Crim. App. 1994). Horizontal or lateral gaze nystagmus refers to the inability of the eyes to smoothly follow an object moving horizontally across the field of vision, particularly when the object is held at an angle of forty-five degrees or more to the side. *Webster v. State*, 26 S.W.3d 717, 719 n.1 (Tex. App.—Waco 2000, pet. ref'd) (citing NATIONAL HIGHWAY TRAFFIC SAFETY ADMIN., U.S. DEP'T OF TRANSP., DWI DETECTION & STANDARDIZED FIELD SOBRIETY TESTING, Student Manual VIII—12–15 (1995) ("NHTSA Manual")).

[2]West testified that he checked for equal tracking and pupil size in order to determine if Bates had any type of brain injury, which would disqualify him as an appropriate subject for the HGN.

5

correctly. West testified that most people are able to follow the instructions the first time, but that it was more difficult for an intoxicated person to follow them. After administering the HGN, West concluded that Bates failed the test because he (1) lacked smooth pursuit in each eye, (2) had a distinct and sustained nystagmus at maximum deviation in each eye, and (3) had onset of nystagmus prior to forty-five degrees in each eye. West opined that through his training and experience, prescription drugs cause "the type of nystagmus" that he looks for during the HGN. West asked Bates if he suffered from any kind of head injury, and Bates told him that he had no major head injuries, but that he had been hit in the head from time to time. Bates did not, however, indicate that he had been hit in the head recently.

Next, Bates was asked to perform a "one-leg stand," which entails placing one's feet together then holding up one leg for thirty seconds. Before he required Bates to perform a one-leg stand, West asked whether or not Bates had any physical issues with his legs. Bates told West that he previously had surgery on his legs, but he did not indicate when the surgery had taken place. After listening to the instructions twice, Bates failed the test when he put his foot down and used his arms for balance. West then demonstrated the "walk and turn" exercise for Bates. West testified that this test contains eight "clues" that a person is intoxicated and indicated that Bates showed three of those clues.[3] Bates was then asked to recite the alphabet, which he successfully completed. He also successfully completed the "finger touch" exercise without exhibiting any clues of intoxication. During the testing process, Bates informed West that he had "taken a pain

---

[3]West originally testified that the "walk and turn" test contains six possible clues that a person is intoxicated. He later corrected his testimony by clarifying that there are eight clues of intoxication associated with this test.

killer" about two hours before he was stopped, but he did not identify the type of pain medication or the amount taken. Bates also informed West that he was "on anti-anxiety medication," but he volunteered no other details concerning that medication.

Based on his conversation with Erickson at the convenience store, Bates' performance on the administered sobriety tests, and the information gathered from Bates during the encounter, West believed that Bates was intoxicated and under the influence of narcotics even though he did not smell the odor of alcohol. As a result, West arrested Bates for DWI.

At trial, the jury heard evidence that Bates saw a physician on August 30, 2013, two days before the incident. The jury also learned that as a result of his August 30 medical consult, Bates' physician prescribed him (1) amphetamine salt combo, (2) Klonopin, (3) Norco, and (4) Xanax and that the "start date" for these prescriptions was August 30, 2013. In addition, West testified (1) that he was familiar with Klonopin, Norco, and Xanax; (2) that Xanax was commonly referred to by its street name—"bars"—and that it was an anti-anxiety medication; (4) that Norco was a narcotic; and (3) that he believed Klononpin was an antipsychotic. The jury was allowed to view a video of the interaction between West and Bates captured by the dash-cam in West's patrol car, which, for the most part, reflected West's recollection of the events. In addition, the State offered Bates' medical records which reflected he presently has or did have (1) arthritis in both knees, (2) bone grafts, (3) plates in his legs, (4) back pain, (5) cervical pain syndrome, (6) degenerative arthritis, (7) degenerative joint disease, (8) an elbow strain, (9) knee surgeries, and (10) a fractured tibia.

## II.    Standard of Review

In evaluating the legal sufficiency of the evidence to prove the charged offense, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense of DWI beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal sufficiency under the direction of *Brooks*, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *see also Vega v. State*, 267 S.W.3d 912, 916 (Tex. Crim. App. 2008).

## III.    Analysis

Bates claims the evidence is insufficient to prove that he was intoxicated under any of the legal definitions of intoxication.[4, 5] We disagree. A person commits the offense of DWI if he operates a motor vehicle in a public place without the normal use of his mental or physical faculties

---

[4]At trial, the State neither presented evidence nor argued that Bates had consumed alcohol prior to his arrest.

[5]The Texas Penal Code defines "intoxicated" as "(A) not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of those substances or any substance into the body; or (B) having an alcohol concentration of 0.08 or more." TEX. PENAL CODE ANN. § 49.01(2)(A), (B) (West 2011); *see Kirsch v. State*, 306 S.W.3d 738, 743 (Tex. Crim. App. 2010). Here, the impairment theory of intoxication is at issue.

due to the introduction of alcohol or other substances into the body. TEX. PENAL CODE ANN. § 49.04(a) (West Supp. 2014). For purposes of the statute, proving an exact intoxicant is not an element of the offense. *Gray v. State*, 152 S.W.3d 125, 132 (Tex. Crim. App. 2004). Moreover, circumstantial evidence may prove that a person has lost the normal use of his mental and physical faculties due to the introduction of an intoxicant into his body. *Kuciemba v. State,* 310 S.W.3d 460, 462 (Tex. Crim. App. 2010). Circumstantial evidence is as probative as direct evidence in establishing guilt. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). "Futhermore, the standard of review on appeal is the same for both direct and circumstantial evidence cases." *Id.*

Lack of balance or slurred speech can prove intoxication. *Griffith v. State*, 55 S.W.3d 598, 601 (Tex. Crim. App. 2001). Poor performance on standardized field sobriety tests is also evidence of intoxication. *Zill v. State*, 355 S.W.3d 778, 786 (Tex. App.—Houston [1st Dist.] 2011, no pet.). As a general rule, a law enforcement officer's testimony that a person is intoxicated is sufficient proof to establish the intoxication element of DWI. *See Annis v. State*, 578 S.W.2d 406, 407 (Tex. Crim. App. 1979) (reasoning that officer's testimony of intoxication provided sufficient evidence to establish element of intoxication); *see also Henderson v. State*, 29 S.W.3d 616, 622 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (stating testimony of police officer that individual is intoxicated is probative evidence of intoxication).

Bates first highlights the lack of evidence showing he smelled of alcohol, was slurring his speech, had glassy eyes, or was driving erratically. While this may be factually accurate, it is simply irrelevant given the facts and circumstances of this case. Bates also contends the HGN

9

results were not trustworthy because "White[6] [sic] failed to properly screen Bates for the test." West admitted that the strobe lights on his patrol vehicle might have caused an issue with the initial steps of the HGN test. However, he also testified that after turning the strobe lights off, he re-administered the HGN, and Bates showed six clues of intoxication.

In addition, Bates maintains that the results of the HGN are of little or no value because "according to the State's own witness Officer White [sic], there are no known studies that correlate the results of [HGN] to intoxication with any drug other than alcohol." In *Emerson v. State*, the Texas Court of Criminal Appeals examined the underlying scientific theory of HGN testing, its uses, and its correct application. The *Emerson* court found that testimony concerning an individual's performance on the HGN is admissible if it is shown that the witness is qualified as an expert on the HGN.[7] *Emerson v. State*, 880 S.W.2d 759, 769 (Tex. Crim. App. 1994). Acknowledging that consumption of alcohol exaggerates nystagmus to the degree it can be recognized by the naked eye, the *Emerson* court also noted that "nystagmus may also be caused by factors other than alcohol, such as drugs, neurological disorders, or brain damage." *Id.* at 766. While West conceded that he was unaware of any studies that showed a correlation between HGN and intoxication via drug use, he also testified that through his training and experience, prescription medications can cause the type of nystagmus he was looking for when he conducted the HGN on Bates.

---

[6]When Bates refers to "White," we presume he is referring to Officer West.

[7]On appeal, Bates does not raise the issue of West's qualifications to testify about the results of his HGN, only that the results were flawed and, therefore, the jury should not have considered them as probative evidence.

Next, Bates emphasizes that he passed two of the four field sobriety tests involving his mental or physical faculties (recitation of the alphabet and the "finger touch" test). As to the remaining two tests (the one-leg stand and the walk and turn tests), Bates attributes his poor performance on those tests to the physical impairments to his knees and legs, as demonstrated by his medical records. Bates did, in fact, inform West of his physical deficiencies prior to attempting the one-leg stand and the walk and turn. Likewise, his medical records support his contention that he previously underwent surgeries and was, at the time of the incident, under the care of a physician. Bates' medical records confirmed that he had recently been prescribed various types of medications, including pain medication and anti-anxiety medication. Moreover, Bates admitted to West that he had recently taken anti-anxiety medication and that approximately two hours before he was stopped, he had taken pain medication.

In *Landers v. State*, 110 S.W.3d 617, 620–21 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd), our sister court held that the evidence was sufficient to support a conviction for felony DWI when the appellant admitted to ingesting prescription medication and appeared sluggish, stumbled, had poor concentration, and slurred words. While there is no evidence in this case that Bates appeared sluggish, stumbled, or slurred his words, there is evidence that Bates was "real fidgety" and that his behavior could be described as "being drunk." Erickson, the store clerk, was so concerned with Bates' behavior in the convenience store that he contacted law enforcement, which he rarely did, because he was afraid Bates might be a danger to himself or others. In addition, the dash-cam video recording also shows Bates (1) walking with an unsteady gait upon exiting his vehicle, (2) repeatedly failing to understand the instructions he was given by West, (3) failing to

11

successfully complete two of the field sobriety tests, and (3) behaving in an erratic and belligerent fashion.

West testified that he believed Bates was intoxicated, despite having knowledge of his physical issues. West did not base his opinion solely on Bates' failure to successfully complete the one-leg stand and the walk and turn. West believed Bates was intoxicated after considering the totality of the circumstances, which included (1) his conversation with Erickson regarding Bates' odd behavior in the convenience store, (2) Bates' own behavior during the incident, (3) the results of the HGN, (4) Bates' repeated failure to comprehend instructions, (5) Bates' admission that he had taken a "pain-killer" approximately two hours prior to the incident, (6) Bates' statement that he was on anti-anxiety medication, and (7) Bates' unsatisfactory completion of the one-leg test and the walk and turn.

As the trier of fact, the jury was free to believe or disbelieve any, all, or none of the evidence and to reconcile inconsistencies as it saw fit. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). We must defer to the jury's credibility determinations. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979); *Bowden v. State*, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982) (holding that conflicts in evidence are reconciled by jury and will not result in reversal as long as there is enough credible testimony to support verdict). In this case, the jury was allowed to view via the dash-cam recording a good portion of the interaction between West and Bates as it unfolded. It also heard evidence relating to Bates' physical conditions, and his argument that the field sobriety tests were inadequate and unfair due to his physical limitations. The jurors chose to

12

believe the testimony of Erickson and West that Bates was intoxicated despite Bates' argument to the contrary.

The evidence provided sufficient proof from which a jury could have concluded that Bates had lost his normal physical or mental faculties due to an intoxicant. We overrule Bates' point of error.

## IV. Conclusion

We affirm the trial court's judgment.


Ralph K. Burgess
Justice

Date Submitted:     April 27, 2015
Date Decided:       June 25, 2015

Do Not Publish