

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-17-00214-CR

_____

JIMMIE RAY JOHNSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 2
Hunt County, Texas
Trial Court No. CR1601102

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

# MEMORANDUM OPINION

A Hunt County jury convicted Jimmie Ray Johnson of the class B misdemeanor of driving while intoxicated (DWI).[1]  *See* TEX. PENAL CODE ANN. § 49.04 (West Supp. 2018).  Johnson appeals, arguing that the trial court erred in admitting testimony about the allegedly unreliable results of Johnson's horizontal gaze nystagmus (HGN) test.  We find that the HGN test was admissible and that probative value of this evidence was not substantially outweighed by the danger of unfair prejudice or the danger of misleading the jury.  *See* TEX. R. EVID. 403.  We affirm the trial court's judgment and sentence.

## I.      Background Facts and Trial Testimony

Around 8:00 p.m. on August 26, 2016, Johnson wrecked his motorcycle on Interstate 30 (I-30) near Greenville, Texas.  A concerned motorist, Aaron Watson, called 9-1-1 and pulled over to check on Johnson's well-being.  Watson testified that Johnson was lying on a concrete slab near a drainage ditch with his face partially in the water.  Watson initially feared Johnson was dead.  However, Johnson responded when Watson touched his leg.  Watson explained, "Once he got up and sat down, he was fine."  He also testified that Johnson's motorcycle was "upside down smoking in the ditch."  Watson did not smell alcohol during his interaction with Johnson.

Two Texas Department of Public Safety (DPS) troopers arrived at the scene.  Trooper Dustin Oliver described Johnson as disoriented and said he smelled alcohol coming from Johnson's person. The lead investigator, Trooper William Yanish, said Johnson seemed confused

---

[1]Johnson was charged by information with the Class A misdemeanor of DWI with a blood alcohol concentration (BAC) of 0.15 or higher.  *See* TEX. PENAL CODE ANN. § 49.04(d).  However, the jury convicted on the lesser offense.

or disoriented. Initially, Johnson told Yanish he was both coming from and headed to the town of Poetry. Then Johnson told Yanish he was coming from a bar in Greenville. Yanish also smelled alcohol on Johnson and observed his eyes to be glassy and red. When Yanish asked Johnson if he had been drinking, Johnson said he had consumed "one beer a couple of hours prior to the crash." Johnson also told Yanish he had been at work that day, but he later said he had made a mistake and that he was not working that day.[2]

Yanish then began to administer standardized field sobriety tests to Johnson. He first administered the HGN test. According to Yanish, Johnson demonstrated three nystagmus clues on each eye. Specifically, Yanish testified that he demonstrated nystagmus—or a lack of smooth pursuit in each eye—when Yanish moved his pen from the center in front of Johnson's nose to either side of his head. He similarly exhibited nystagmus when Yanish moved his pen to the end of Johnson's periperhal vision and held the pen steady for four seconds. Yanish also noted nystagmus as he slowly moved his pen to a forty-five-degree point on each side of Johnson's head.

Johnson attempted to do a walk-and-turn test, but could not complete it. However, he complained of pain in his knee, and in the dash-cam video from Yanish's car, Johnson can be seen bending over and holding his knee.[3] Johnson was also unable to perform a one-leg balance test.

---

[2]A paramedic at the scene testified that Johnson complained of pain in his right knee, but otherwise made no complaints. Johnson exhibited no signs of having a head injury such as confusion or unequal pupils according to the paramedic.

[3]Johnson refused entreaties from emergency medical technicians to go to the hospital. He professed that he was fine and suffered no injury throughout his discourse with the paramedics and most of his conversation with Yanish. Only after he had been placed under arrest did he mention an ankle injury. Still, he told Yanish he did not need medical attention. By the time they arrived at the police station, Yanish noticed swelling in Johnson's ankle. After Johnson gave breath samples on the Intoxilyzer machine, Yanish called Johnson's wife to take Johnson to the hospital, rather than booking him into the county jail.

Yanish then administered two divided attention tests. First, he asked Johnson to count from one to four, and then from four to one, touching each finger to his thumb as he counted. Johnson can be heard on the dash-cam recording miscounting at least twice during several attempts of this activity. Finally, Yanish asked Johnson to recite the alphabet from C to M. Johnson made several errors as he performed this test. At that point, Yanish arrested Johnson for DWI.

In his case-in-chief, Johnson presented testimony from a forensic toxicologist. Dr. Gary Wimbish described the process of absorption and elimination of alcohol in the bloodstream and several other matters related to intoxication. He also testified that the flashing emergency lights and traffic lights from vehicles on I-30 made it impossible to perform a valid HGN test. Dr. Wimbish pointed to the fact that the National Highway Transportation Safety Administration (NHTSA) has established no protocol for conducting an HGN test with "strobe lights" in the field of vision. However, Dr. Wimbish also conceded there were "no studies developed" on whether a HGN test could validly be performed if an optokinetic effect[4] were present within the test subject's field of vision.

## II.    Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Abuse of discretion occurs only

---

[4]Dr. Wimbish described optokinetic nystagmus as "an artificial production of nystagmus from light intensity in the region of a person's sight that goes on and off, on and off, or changes in intensity as to low and high intensities. Those can cause the eye -- trying to keep up with those changes, a motion of jerking in the eye." Trooper Yanish explained the phenomenon as "when the eye is fixated on a moving object. And once it stops, you might -- there might be nystagmus." The term came up in trial as part of Johnson's argument that the flashing lights from the emergency vehicles could stimulate this type of nystagmus as opposed to the horizontal nystagmus detected in HGN tests.

if the decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). We may not substitute our own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). We defer to the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Notwithstanding its general admissibility, relevant evidence is subject to exclusion "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ." TEX. R. EVID. 403. Where a trial court is considering the application of Rule 403 to challenged evidence, the court must balance the following factors:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. Of course, these factors may well blend together in practice.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006) (footnote omitted).

## III.    Analysis

Johnson argues that the trial court erred in admitting Yanish's testimony concerning the results of Johnson's HGN test. Johnson argues that the circumstances of the HGN test were so

5

unreliable that introduction of that evidence was unduly prejudicial. In support of his argument, Johnson points to several factors that he believes invalidated the HGN test. Primarily, he notes that the accident and investigation occurred after dark and that in one recording of the scene, two emergency response vehicles with flashing emergency lights were present while the test was being administered. Also, during the HGN test, Johnson faced Yanish, with his back to I-30, and a fire truck with flashing lights was on Johnson's left.

During his cross-examination of Yanish, Johnson's attorney attempted to establish that the emergency vehicles' flashing lights would have distracted Johnson, resulting in involuntary twitches of his eyes that could have yielded false indications of HGN. Yanish agreed that "nobody is going to be able to overlook a strobe effect" like that which the emergency lights created.[5] However, Yanish countered that, if a subject did not have "a problem following the stylus" it indicates that any "strobe effect" did not interfere with the administration of a valid HGN test.

In *Emerson v. State*, the Texas Court of Criminal Appeals held that "the theory underlying the HGN test" has been found "sufficiently reliable pursuant to Texas Rule of . . . Evidence 702 [(regarding testimony of expert witnesses)]." *Emerson v. State*, 880 S.W.2d 759, 768 (Tex. Crim. App. 1994).[6] The Texas Court of Criminal Appeals also found that "the technique employed in

---

[5]Johnson's questions to Yanish characterized the emergency flashing lights as looking "like a carnival," and he stated that the lights were "going off like it's Christmas, just strobes up and down."

[6]*Emerson* detailed the proper administration of an HGN examination, the scientific basis for the test, and how its results are relevant to developing suspicion and probable cause to arrest for an intoxication offense. *See Emerson*, 880 S.W.2d at 764–69.

the HGN test [is] a reliable *indicator of intoxication*." *Id.*[7] Yet, while the court found it appropriate to "take judicial notice of the reliability of both the theory underlying the HGN test and its technique," it also explicitly stated it was "unable to conclude . . . that the HGN technique is a sufficiently reliable indicator of *precise BAC*." *Id.* at 769.

In *Compton*, we considered the admissibility of an HGN test where the trooper did not administer the test in complete compliance with the NHTSA protocol. *Compton*, 120 S.W.3d at 378. In that case, the appellant, Compton, complained that the trooper "moved the stimulus two and a half seconds faster than recommended for each eye." *Id.* After noting that "[t]he manual itself only provides approximations of the time required for properly conducting the tests," we found that "[a]ny variation in the time taken to appropriately position the eyes would have no effect on the reliability of this test and cannot form the basis for excluding the results from the evidence presented at trial." *Id.* at 379.

The Corpus Christi Court of Appeals cited *Compton* when reviewing a situation similar to the present case. In *Hartman v. State*, the trooper administering the HGN test acknowledged that the defendant, Hartman, was facing oncoming traffic while being tested. *Hartman v. State*, 198 S.W.3d 829, 839 (Tex. App.—Corpus Christi 2006, pet. stricken). Specifically,

---

[7]As explained by the Texas Court of Criminal Appeals,

> In this jurisdiction, officers who administer the HGN test receive standardized training in its administration. When administering the HGN test, those officers must follow standardized procedures as outlined in the *DWI Detection* manual published by NHTSA. The test procedures, as outlined in the manual, require an officer to screen for factors other than alcohol that potentially contribute to, or cause, nystagmus, such as other drugs, neurological disorders, and brain damage, prior to administering the HGN test.

*Emerson*, 880 S.W.2d at 768. The court cited with approval, and rested much of its analysis, on the publications and research from the NHTSA. *See id.*

> Trooper Gonzales testified that Hartman faced traffic when he conducted the HGN test and she failed the test. He acknowledged that he did not have Hartman turn away from the oncoming traffic when administering the test, but he was able to determine the indicator of intoxication—involuntary jerking of the eyes—even when there was no oncoming traffic.

*Id.* In affirming the admission of the HGN test results, the court of appeals held that the factors in that case went to the weight of the evidence, rather than its admissibility: "Although sobriety tests, when administered under ideal conditions, will generally serve as valid and useful indicators of impairment, slight variations from the ideal may have some effect on the evidentiary weight given to the results." *Id.* (citing *Compton*, 120 S.W.3d at 378).[8]

In the present case, Trooper Yanish was qualified to administer the HGN test and testify as an expert about the results. He had served as a DPS trooper for fourteen years. He received regular continuing education on standardized field sobriety testing "[e]very couple of years" and had certification in administering such tests. He received additional training in intoxicated driving situations, though he did not specify the nature of this additional training. He had also worked "[n]umerous" vehicle crashes involving intoxicated drivers.

Moreover, Yanish described the process for administering the HGN test in detail:

> After we check to see if they're a candidate,[9] the next thing is lack of smooth pursuit. . . . [T]hat entails . . . taking your finger, starting with their left eye, going from the nose out, back to the nose, back out the other way. And doing that for a

---

[8]The *Hartman* court went on to point out that, "[e]ven assuming Trooper Gonzales deviated from the standard for administering the HGN test by allowing Hartman to face traffic while performing the test," the appellant could not show harm. The trooper was qualified to administer the test and testify to its results; further, the test was only one of several factors he considered in determining that Hartman was intoxicated. *Hartman*, 198 S.W.3d at 840.

[9]The testing officer first determines if the subject's pupils are equal and exhibit no resting nystagmus. He then determines if the subject's eyes track equally.

8

> total of two passes. . . . [I]t's approximately one second out. One second back to the nose. One second out. One second back to the nose.

Yanish testified that he looks to see if the test subject can demonstrate "smooth pursuit," i.e., "roll[ing] . . . like a marble going across a piece of glass." According to Yanish, lack of smooth pursuit is indicative of intoxication. He testified that he next looks "for distinct and sustained nystagmus at maximum deviation."

> [W]e . . . go to left, take their eye as far as possible with no white showing over here in the corner of their eye. Hold it there for approximately four seconds, check to see if the eye is bouncing back and forth horizontal like this.
>
> . . . .
>
> The next task we check is onset of nystagmus before 45 degrees. And on that one we take our finger starting at the beginning of their nose. We take it out approximately four seconds very slow, take about four seconds out there. We don't want to go past or just beyond their shoulder with a little white remaining in the side of their eye. And once . . . we see the nystagmus, the popping, we stop and verify it.

Yanish acknowledged that the emergency vehicles' flashing lights "could have" interfered with the HGN testing. However, he also testified that the fact that the test subject is able to follow his finger or stylus indicates that the lights are not affecting the test. Yanish testified that Johnson was able to follow Yanish's stylus as he administered the test. Thus, Yanish concluded that the flashing lights did not affect the HGN testing or results. Further, Yanish testified that optokinetic nystagmus[10] occurrs "when the eye is fixated on a moving object. And once it stops, you might -- there might be nystagmus." While he admitted that it was possible the flashing lights interfered

---

[10]See *supra* note 4.

with his testing, Yanish was confident they had not because Johnson was able to stay focused on Yanish's pen.

Dr. Wimbish testified that, in his opinion, the emergency vehicles' flashing lights would cause "[o]ptokinetic nystagmus." Dr. Wimbish also testified that where the intensity of lights is "changing in the immediate field of the person, the horizontal gaze and nystagmus is invalid" and the test subject must be "moved to a location away from that sight, so there's no change in the intensity of lights in the field of vision." Dr. Wimbish told the jury that there was no "protocol . . . permit[ting] the administration of an HGN test when there are strobe lights within the field of vision," although he also acknowledged that there were "no studies developed" addressing whether a valid HGN result could be obtained in such a situation. As for the I-30 traffic crossing behind Trooper Yanish in Johnson's line of sight, Dr. Wimbish testified, "[T]he officer in the procedure is required to put that subject's back to the lights, so there is no changing of intensity in his field of vision that is producing optokinetic nystagmus."

## IV.    Rule 403 Satisfied

Johnson argues that the danger of misleading the jury substantially outweighed whatever probative value there was in the HGN test results. According to Johnson, because the HGN testing was "outwardly scientific evidence . . . almost sure to be accepted by a jury," the evidence was likely to mislead the jury. At the very least, he argues, the jury would give undue weight to such evidence. We do not find the HGN evidence presented such a danger.

The HGN test was germane to one of the main facts of consequence, namely, whether Johnson was intoxicated at the time he was driving (and ultimately crashing) his motorcycle on

10

Interstate 30. Three tests are commonly administered in DWI investigations: the HGN test, the walk-and-turn test, and the one-leg-stand test. Yet, Johnson was unable to perform either the walk-and-turn or the one-leg-stand tests due to a recent knee surgery. Moreover, Johnson's speech often was not slurred in the recordings admitted into evidence. Therefore, the State had need of this evidence, with its "inherent[ly] probative force," in proving the State's DWI allegation. *Gigliobianco*, 210 S.W.3d at 641.

We are not convinced that the HGN evidence was likely to impress the jury in some irrational, yet indelible, manner. Johnson capably challenged the testing, including presenting his own expert testimony about the efficacy of the testing in the presence of the flashing lights. It was appropriate to allow the jury to weigh and resolve any conflicts.

Further, reviewing the record as a whole, we cannot say that the HGN evidence had "any tendency . . . to confuse or distract the jury from the main issues . . . [or] be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence . . . ." *Id.* Yanish explained the HGN test in detail. He discussed for the jury what the test was designed to discover and how that information was relevant to determining whether Johnson was intoxicated. *See id.*

Likewise, it cannot be said that it took "an inordinate amount of time," *id.*, to develop the evidence about Johnson's performance on the HGN examination, nor was this evidence repetitive of other evidence. The record reflects forty-nine pages of direct testimony from Trooper Yanish, but only nine of those pages were devoted to Yanish's testimony regarding the HGN test, including

11

his explanation of how the test is administered and how it is a tool for recognizing signs of intoxication. In light of his testimony, this was not a prejudicial amount of time.

Consequently, we find that "[t]he trial court, after balancing the various Rule 403 factors, could have reasonably concluded that the probative value of appellant's [HGN] test results was not substantially outweighed by the countervailing factors specified in the rule." *Id.* at 642. We therefore conclude that the trial court did not abuse its discretion in allowing the challenged evidence.[11]

We affirm the trial court's judgment.


Ralph K. Burgess
Justice

Date Submitted:     September 14, 2018
Date Decided:       October 17, 2018

Do Not Publish

---

[11]Finding no error in admission of the evidence, a harm analysis is unnecessary.

12